## HUGHES TOOL CO. v. FORD.
### Civ. No. 2537.

United States District Court
E. D. Oklahoma.
July 2, 1953.

Bohanon & Adams, Oklahoma City, Okl., George I. Haight, Chicago, Ill., R. F. Campbell, Houston, Tex., for plaintiff.

C. M. McKnight, Tulsa, Okl., and Robert F. Davis, Stevens, Davis, Miller and Mosher, Washington, D. C., for defendant.

WALLACE, District Judge.

The plaintiff, Hughes Tool Company, a Delaware corporation, brings this action against the defendant, R. W. Ford, a resident of Ada, Oklahoma, to:

(1) Enjoin the defendant from future infringement and to recover damages for past infringement of plaintiff's Letters Patent No. 1,856,627, No. 1,983,316 and No. 2,333,746 relating to roller rock bits used in drilling for oil and gas.

(2) Enjoin the defendant from acts of trespass upon and conversion of and to recover damages for past trespasses and conversions of plaintiff's drill bits.

(3) Enjoin the defendant from further interference with and to recover damages for past interference with the plaintiff's lease agreements, whereby the plaintiff leases, rather than sells, the drill bits which it manufactures.

The defendant admits certain acts of welding on the worn cutter teeth of bits of various series of plaintiff's manufacturer but expressly denies that such acts constituted an infringement of lawfully issued patents.

The defendant counterclaims alleging in substance that the plaintiff corporation has used its "lease" agreement as part of a plan to dominate and control the roller rock bit industry and charges that the plaintiff corporation is operating in violation of the antitrust statutes. Defendant in his counterclaim requests the Court to find the plaintiff to be in violation of the antitrust laws, to decree that the patents and the "lease" contract here involved to be unenforceable, to enjoin any future monopolistic practices by the plaintiff, and to decree an accounting for the purpose of determining the damage done to this defendant for the purpose of awarding relief in accordance with Section 4 of the Clayton Act, 15 U.S.C.A. § 15.

The evidence introduced at the time of trial of these issues consisted of oral testimony, testimony given in discovery depositions, the records of testimony given in former cases introduced upon stipulation of counsel, and a large number of exhibits.

I

The plaintiff is the owner of Fletcher Patent No. 1,856,627, Scott and Garfield Patent No. 1,983,316, and the Scott, Garfield and Cockrum Patent No. 2,333,746 and in this action sues for past infringement.

The validity of Patent No. 1,856,627 and Patent No. 1,983,316 was not attacked by the defendant.

The defendant admittedly retipped [1] partially worn down teeth of drill bits of plaintiff's manufacture made in accordance with Patent No. 1,856,627 and Patent No. 1,983,316. However, defendant argues that inasmuch as he merely retipped partially worn down teeth of drill bits made in accordance with Patent No. 1,856,627 and merely retipped partially worn down teeth, that were still interfitting, on drill bits made in accordance with Patent No. 1,983,316, that such acts did not constitute an infringement of these two letters patent, but were only permissible repair.

Such a contention is foreclosed by the ruling in the first Williams case which involved retipping in regard to these same two patents. In his opinion Chief Judge Phillips said: [2]

"Williams, by his process of retipping, undertakes to restore the worn-out teeth as

1. Retipping is accomplished by placing the dull bit in a tub of cold water in such a position as to permit a few of the tooth stubs to be exposed; tungsten carbide is then welded thereon one at a time. The rest of the bit is submerged in the water to protect the temper thereof. Tungsten carbide is welded to a few of the teeth and then the cone is rotated to expose a few more teeth for retipping until all the teeth are retipped. This operation is to be distinguished from old machine rebuilding where there was a dissembling or reconstructing.

2. Williams v. Hughes Tool Co., 10 Cir., 1950, 186 F.2d 278, 284.

nearly as possible to their original form, size, and position. He thus reconstructs and replaces that element of each patent wherein lies the novel features of the combination. We hold that so doing is not permissible repair, but reconstruction, constituting infringement. This conclusion finds support in Hughes Tool Co. v. Owen, 5 Cir., 123 F.2d 950, in Southwestern Tool Co. v. Hughes Tool Co., 10 Cir., 98 F.2d 42, 45; American Cotton Tie Co. v. Simmons, 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79, and Hughes Tool Co. v. United Machine Company, D.C.N.D.Tex., 35 F.Supp 879."

■ Thus, any such acts of retipping by the defendant prior to the expiration dates of these patents constituted an infringement.[3]

The defendant vigorously contests the validity of "Patent No. 3" in suit, the Scott et al. Patent No. 2,333,746, referred to as the "interrupted heel tooth patent."[4]

The plaintiff alleges infringement of claims 1 and 4.[5]

Claim 1 provides:

"In a well drill, a tapered cutter rotably mounted thereon, said cutter having a row of heel teeth circumferentially thereof to cut the outer portion of the well bottom, some of the teeth in said row having a portion projecting from the cutter surface a shorter height than the others, thus providing on said shorter teeth an open area normally out of contact with the well bottom so as to allow cleaning of the cutter by the flushing fluid, and a gage cutting surface on the outer ends of all said teeth to engage the wall of the well."

Claim 4 provides:

"In a well drill, an inwardly tapering cutter having a row of teeth circumferentially around the same, the outer ends of which are positioned to cut the side wall of the hole, there being crests on said teeth positioned to engage the bottom of the well, the crests on some of said teeth being comparatively short and extending from the inner ends of said teeth approximately one-half of the length of the tooth, there being formation receiving spaces at the outer ends of said short crested teeth some of said teeth being spaced more closely together in the row to throw the teeth out of step on bottom."

Counsel for plaintiff in making a preliminary statement regarding the object of this patent said:[6]

"Also Hughes Tool Company wanted to increase the speed in those formations [sticky formations], clean them better, and then they did what was really, well really it was a crazy sort of thing, having new teeth on the cutter, going to the trouble of making the invention, in order to accomplish it they then cut them off, or part of them. The witness can give more explanation of it, but in the heel row now, they take, in this illustration, it's every alternative two and they cut away the outer end of that tooth crest. See, the way that's cut away as shown here on this bit, so they cut away alternative ends of the teeth in the heel row. The patent points out that there can be variations as how that is done.

"Well now, what was the result? Certainly no one had ever thought of doing it before. Actually, just cutting away part of those two crests, they got a very material increase in speed in these formations, the drilling was faster. Another curious thing in instances they would stay in the hole longer, actually have less teeth, they'd get more footage out of it, and while this is not as pronounced, perhaps, as the increase in speed in those formations, there was a very pronounced increase in speed."

An aim of the patented invention is to generally preserve the spacing of such rock

---

3. Since the filing of this lawsuit, both patents have expired. Patent No. 1,856,627 expired May 3, 1949, and Patent No. 1,983,316 expired December 4, 1951.

4. This patent was included in this lawsuit ■■■■■■■

by an amendment to the complaint on July 25, 1952, just prior to trial.

5. (PX-4, p. 3).

6. (R-20).

teeth and the traction for the cutters which such teeth provide, and to improve the penetration and resulting drilling speed.

The advantage in reducing tooth contact is that with a given weight upon the bit the unit loading upon each tooth is thereby increased; and this results in a more effective fracture of the well bottom.

As stated in the patent application: [7]

"We also aim to provide greater amount of space on the cutter in which the material displaced by the cutter teeth may move and thus be better carried away by the flushing fluid and by so doing avoid clogging of the cutter by the formation being drilled."

 Although the plaintiff has submitted a considerable amount of evidence tending to prove the marked superiority of the bits employing the "interrupted heel teeth" the Court is of the opinion that this improvement does not rise to the dignity of invention. Unquestionably, this alteration in the structure of the "heel teeth" has resulted in a better drilling bit; however, every improvement upon a known process or invention does not necessarily smack of the genius of invention.

As said in Great A. & P. Tea Co. v. Supermarket Equipment Corp: [8]

"The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. * * *"

This same principle was recognized and applied by Judge Pickett in Kobe, Inc. v. Demsey Pump Co. when he said: [9]

"* * * * The arrangement control valve in the piston assembly is new

but we agree with the trial court that this is nothing more than the application of mechanical skill and is not an invention. It required no greater skill or higher thought than that which would be expected of a mechanic trained and skilled in the art. The old and well known elements of the prior art perform the same mechanical functions in these claims as they have been known to perform in the prior art and they produce the same result and cannot be considered an invention. The changes made in this device would readily occur to one skilled and acquainted with the already crowded art. * * *

"The language used by this court in Shaffer v. Armer, 10 Cir., 184 F.2d 303, 307, is particularly applicable where it was said: ' "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts." Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438. The device must not only be "new and useful," it must also amount to "invention or discovery," Thompson v. Boisselier, 114 U.S. 1, 11, 5 S.Ct. 1042, 1047, 29 L.Ed. 76; and *perfection of workmanship, however much it may increase the convenience, extend the use, or diminish expense, is not patentable.*' Reckendorfer v. Faber, 92 U.S. 347, 356–357, 23 L.Ed. 719. * * *.' " (Emphasis supplied.)

L. L. Payne, assistant vice-president of engineering for plaintiff corporation, was the plaintiff's chief witness to support the validity of "Patent No. 3". He is a very intelligent and well qualified engineer who made a most capable witness. However, apart from the many technical niceties and scholarly scientific expressions it is apparent that the vital principle of this improvement is the spacing the heel teeth

---

7. (PX–2, p. 1).

8. 1950, 340 U.S. 147, 152, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162. Cited in Kobe, Inc., v. Dempsey Pump Co., 10 Cir., 1952, 198 F.2d 416.

9. 198 F.2d at page 430.

farther apart, to reduce the amount of "sticking up" in the softer drilling formations,[10] and a reducing in the size of the teeth at point of contact so as to obtain concentration of weight and pressure at the point where the tooth rests upon the bottom of the hole.

In "Patent No. 3", the plaintiff deletes the opposite end of each successive wide heel tooth to gain this effect; in substance this is the same as simply staggering two rows of narrow heel teeth, although structurally, doubtless, the deleting method enjoys some advantage.[11]

The fact that the teeth should in effect be "staggered" or irregularly arranged to avoid tracking in the rock teeth formation on the well bottom was recognized in "Patent No. 1" in suit. In sustaining the validity of that patent, in the first Williams case, supra, Chief Judge Phillips said:[12]

"The teeth, being of approximately equal size, have substantially equal penetration and wearing life. This increases the effectiveness and the useful life of the cutters. The staggered arrangement of the teeth eliminates the tendency of the rows of teeth to track and to bounce from one row to the other as the cutter revolves, and effects uniform cutting of the entire bottom of the hole. * * *"

At the time the patent under consideration was being worked upon it was well known that a reduction in the area of the tooth crests touching the bottom of the well hole would increase cutting speed and permit better cleaning.

Mr. Payne, upon cross-examination, testified as follows:[13]

"Q. Didn't your organization learn at that time, and as a result of the Fletcher development, if you reduce the number of teeth on the bottom at one time, you would get better penetration with less weight down the hole drilled? A. Yes, we recognized if you had less tooth contact you would get more effective penetration into the formation under a given loading.

"Q. So at that time, which was long before the time of this present patent, your research department knew the way to get better penetration was to reduce the tooth contact on bottom? A. It recognized that you could get more effective penetration, but there were other things that confronted them at the time that did not permit them to utilize such a structure, reducing the tooth contact of that drastically, and it has been done in this structure.

"Q. But they did reduce them quite drastically in the Scott and Wellensiek patent in the other suit? A. That is correct."

Also, in the first Williams case, supra, Judge Phillips in recognizing the validity of "Patent No. 1" in suit said:[14]

---

10. Payne conceded that the general advantage to be gained by wider spacing in tooth manufacture was known to the art prior to the time of the development of the patent under consideration. (R–101, 102).

11. Obviously, there is a certain structural strength which is realized by deleting one wide tooth rather than by spacing two narrow heel rows in alternate positions.

12. Fn. 2 supra, 186 F.2d at page 280.

13. (R–81).

14. Fn. 2 supra, 186 F.2d at page 280.
 It is noteworthy that Judge Phillips in this same Williams case, in ruling "Patent No. 2" in suit to be an invention touched closely upon several of the reasons now argued by plaintiff to support the validity of "Patent No. 3", when he said: "The advantages of the Scott and Garfield three-cone bit over prior-art bits are these: It has a broader base, resulting from the use of three cones instead of two, giving a more uniform distribution of weight. It permits the use of longer teeth and will carry greater weight. It produces less torque and runs more smoothly. It produces less stress and shock on the component parts of the bit and the other drilling equipment, reducing fatigue failures. It may be rotated more rapidly. It maintains better gauge, making less reaming of the hole necessary. It is more easily cleaned. It increases drilling speed approximately 100 per cent. It lasts longer." Fn. 2 supra, 186 F.2d at page 281.

"\* \* \* It also results in the weight of the drill being brought to bear upon a lesser number of teeth as the rotation of the cutter brings the teeth in contact with the formation, thereby increasing their penetration and effectiveness. \* \* \*"

The improvement attained in "staggering" the heel teeth of the bit is such an improvement as any skilled artisan with a knowledge of the state of the art in question might be expected to make. Such an improvement is not discovery.[15]

15. That such improvement demonstrated by this patent was short of discovery or invention is implied in a degree by the testimony of Stanley C. Moore, former Field Engineer, for the plaintiff, who in describing the origin of this improvement said:

"Q. While you were a field engineer, did you have any occasion to devote any attention to any work on Hughes rock bits for interrupted heel teeth? A. Yes, sir, I did.

"Q. How did that start? A. Well, shortly after I moved from Shreveport, Louisiana, to Midland, Texas, I would say it was the early part of 1940, I received a telephone call from Mr. Floyd Scott from Houston, suggesting to me how we might interrupt heel teeth on the O.S.Q.–2 type tri-cone. He gave me a detailed description over the telephone of what I should do. Then I went out into the Hughes shop at Midland and got a welder, Ben Galladay, to help me. We then went out in the dull pile and obtained two or three dull bits of the same type to practice on. We didn't want to ruin a new bit, to learn how to perform this work \* \* \* We then proceeded to interrupt a number of bits at the gauge end. At first, I would mark the tooth off with soap stone showing how they should be interrupted from the gauge surface inward, and after a few bits, Ben Galladay got to where he was as practiced in the art as I was, and we then put a number of the bits in service in the field." (R–129.)

Also, it should not be completely ignored that the plaintiff in urging the validity of "Patent No. 3" submitted into evidence a bit which incorporated only the "interruption of the heel tooth". This implies that the other elements making up this purported invention are not in use. It is well settled that a non-used patent positioned in a crowded art should not be aided by a broad inter-

## II

We now come to the counterclaim of the defendant which charges the plaintiff corporation with operating its roller rock bit business in violation of the antitrust statutes.

Section 1 of the Sherman Act declares contracts, combinations or conspiracies in restraint of interstate trade or commerce to be illegal.[16]

Section 2 of the Sherman Act condemns monopoly itself together with any attempt

pretation of the claims. American Laundry Mach. Co. v. Strike, 10 Cir., 1939, 103 F.2d 453, 457; Kobe, Inc., v. Dempsey Pump Co., fn. 8 supra, 198 F.2d at page 430. The Court in the Kobe case, supra, 198 F.2d at page 430, went on to say: "And to make sure that a monopoly is not granted for mere perfection of workmanship, the courts closely scrutinize claims to combinations for improvements in a crowded art. [Citing cases.]"

16. Title 15, U.S.C.A. § 1 provides: *"Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty.* Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal: *Provided,* That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45, as amended and supplemented, of this title: Provided further, That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices

to monopolize "any part of the trade or commerce".[17]

Section 3 of the Clayton Act makes it unlawful to contract for distribution of commodities in interstate commerce, whether patented or unpatented, where the effect of such "agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." [18]

Section 4 of the Clayton Act provides that any person injured in his business or property by acts prohibited by *any* of the antitrust laws may sue for recovery of treble the amount of such damage.[19]

■ Counsel for plaintiff insist that this counterclaim merely raises again issues of law and fact which have previously been tried and determined; they emphatically argue that the second Williams case [20] recently considered by the Court of Appeals of this district, conclusively determines all the issues involved herein.

Obviously, if such be true, this case would and should be disposed of summarily without a reopening or prolonged consideration by this Court of such settled issues. However, a careful comparison of the evidence in the Williams case, supra, with the evidence in the instant case unmistakably indicates that there is very little if any parallel in the kind, scope and general character of the evidence adduced although concededly almost identical legal questions are raised by the pleadings.

## The Roller Rock Bit Industry

The industry which the defendant charges the plaintiff with dominating contrary to the antitrust laws is the roller rock bit industry.

The most common method of drilling oil and gas wells is by rotating a string of pipe with a cutting tool on the lower end of the pipe known as a bit; liquid, known as drilling mud, is forced through the drill pipe to wash the cuttings from the tool, lubricate the tool and bring the cuttings to the surface of the earth. A great industry has developed in the past fifty years in the manufacture and distribution of drill bits which have rolling or rotating cutters; no other type of drill bits competes direct-

---

on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor * * *."

17. Title 15, U.S.C.A. § 2 provides: *"Monopolizing trade a misdemeanor; penalty.* Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

18. Title 15, U.S.C.A. § 14 provides: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any territory thereof or the District of Columbia or

any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

19. Title 15, U.S.C.A. § 15 provides: *"Suits by persons injured; amount of recovery.* Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. * * *"

20. Williams v. Hughes Tool Co., 10 Cir., 1952, 199 F.2d 862.

ly with roller rock bits and the commerce therein constitutes a distinct and separate industry.

Neither cable tools [21] or other ordinary types of rotary drill bits can be considered in direct competition with the roller rock bits.[22]

The peculiar and distinct advantage and useability of the roller cone rock bit is aptly illustrated by an advertisement published by Sharp-Hughes Tool Company, the plaintiff's legal predecessor, early in the development of the roller rock bit industry.[23]

"Cable tools make holes by slowly pounding the formation. There are only three types of ordinary rotary bits, i. e., the Fish-tail, Diamond Point and the Rotary Shoe. Each drag or scrape their way through the formation, consequently as soon as the keen edge is worn such bits lose 80% of their cutting power. The cutting edges of the S–H Bit roll in a true circle and do not slip or drag, but crush the bottom of the hole into fine grains which are washed to the surface in the circulating water. The crushing operation preserves the edges of the Cone teeth, and enables the Cones to cut an enormous amount of hole. (See page 8.)

"The keen edge of any style of scrape bit is worn off almost instantly when rubbed on hard sand rock. The fish-tail, rotary-shoe, diamond point or inserted blade is of the scrape bit type. The principle of the Cone bit is entirely different. The edges, or the Cone points, roll in a true circle like a cone bearing, and crumble or chip away the rock. The edges give way very slowly. Frequently our bit will drill fifty feet, where a scrape bit will not drill six inches, and frequently rock formation is struck in which the fishtail or inserted blade will not make 2 inches a day. It is therefore more economical in the end to get the S–H Bit to finish the well. Our bit will drill holes right through an emery wheel at the rate of a foot and a half per hour, with but slight wear. A fishtail or inserted blade would be unable to drill an emery wheel composition at all.

"The scrape type of bit running on rock is responsible for many of the fishing jobs, directly caused by crystalized pipe."

Similarly, it is obvious from the plaintiff's "competitive activity reports", beyond question the most accurate and complete compilation of its kind, that the roller rock bits form a competitive market all of their own.[24]

The testimony of various drilling contractors in the Midcontinent area, a rotary drilling area, clearly indicates that although any tool that is capable of making a hole in the ground theoretically may be considered competitive that in reality only roller rock bits are used.

J. W. Garr, drilling contractor in Oklahoma and Texas, with headquarters at Oklahoma City, testified:[25]

"Q. Do you run drag bits now?
A. No, sir.

---

21. Mr. Montrose, vice-president in charge of sales for plaintiff, testified:
 "Q. What do you mean, in one sense pin it down. A. Well, Cable Tool bits are competitive to Hughes rock bits or anybody else's rock bits, but in our competition in the rotary drilling area, we don't count Cable Tool bits as a competitive item. * * *" (DX-24, p. 9.)

22. Mr. Payne, assistant vice-president of engineering for the plaintiff, clearly ruled out the diamond bit as a competitive commodity when he said:
 "Q. You get into the diamond bit? A. Eventually, if it is an extremely hard, abrasive type of material that responds to the diamond bit. The diamond bit is not a bit that crushes the formation like the cutter bit does. It has a plowing action, and as you rotate that diamond, that diamond acts as a little plow and cuts a path out of it as it is rotated on bottom. That type of bit would be absolutely ineffective in drilling low strength, high drillability shale." (R–111.)

23. (DX–71, p. 225.)

24. From 1940 to 1950 (DX–28a–28k).

25. (R–495, 496, 497, 498, 499.)

"Q. How long has it been since you have run one? A. Well, we used to use them under surface holes sometimes, but we haven't run any under suface (sic) pipe for a long time.

"Q. For ten or twelve years? A. I would say that long anyhow.

"Q. But when you did run drag bits, sometimes you might run a drag bit and sometimes a roller cutter bit. Is that right? A. Yes, sir.

\* \* \* \* \* \*

"Q. Have you ever used a diamond bit? A. No, sir.

"Q. Do you know they are used? A. Yes, sir.

"Q. You know there are a lot of oil and gas wells drilled by cable tools? A. I used to own cable tools and operate them.

"Q. Did you run them here in Oklahoma? A. Yes, sir.

\* \* \* \* \* \*

"Q. (By Judge Wallace.) Mr. Garr, in regard to cable tools, how much cable tool drilling is there now comparatively? A. Very little. They used cable tools quite a lot to drill wells in, after the rotary is run and set the cement; maybe around Bartlesville and around Okmulgee and a few places like that, they use cable tools, but all your deeper holes are rotary.

"Q. Counties like Grady and Carter? A. Yes, sir.

"Q. (By Mr. Davis.) These cable tools, fish tail bits, diamond bits, are they at all similar to roller cone or roller bits? A. Well, cable tool bits have a walking beam or studder and on the end of a drilling line to a hole, a string of balls, possibly wouldn't be over 55 or 60 feet long and work off along. They rotate principally by drill pipe.

"Q. Do you consider them something of the same sort as far as digging a hole is concerned? A. A rotary is entirely a different proposition from cable tools.

"Q. And the diamond bit, it could be used in a rotary? A. Used altogether in a rotary.

"Q. But the manner in which it cuts, is it similar to a roller cone bit? A. No, sir.

\* \* \* \* \* \*

"Q. (By Mr. Haight.) Then if you are drilling with a rotary rig, depending upon the formation, you then have a choice of a drag bit, a disc bit, a roller cutter bit, a diamond bit, and a diamond core bit. Is that correct? A. Yes, sir.

\* \* \* \* \* \*

"Q. (By Mr. McKnight.) Mr. Haight asked you if in the rotary method of drilling you did have a choice of five or six bits. That is, the diamond bit, the fish tail bit, the drag bit, cable bit, and so on. Have you ever made any choice other than a roller cone bit to any appreciable extent? A. No, sir."

J. J. Miller, drilling contractor, testified:[26]

"Q. Are there any other types of bits, drilling tools of any kind, that you would consider competitive with a roller rock bit, in other words is there anything else that you can do the same job with in a practical way? A. Other than that type of bit?

"Q. That's right. A. None that I know of."

Section 2 of the Sherman Act prohibits the monopolization of "any part" of trade or commerce; this has been defined by the Supreme Court to "have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce."[27]

As mentioned in the Kobe case, supra, "To constitute a violation of the Act the monopolistic practices need not extend to an

---

26. (R–253.)

27. Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 1934, 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356.

entire industry. The statute prohibits the monopolization of 'any part of the trade or commerce' ".[28]

■ In order to have a violation of the antitrust statutes it is not essential that the article or commodity involved be completely free from alternatives or substitutes, inasmuch as almost every article has competition in some degree from other available articles. No one would question the legal impropriety of a single automotive manufacturer dominating the sale and distribution of all automobiles, even though the purchasing public could always substitute the horse drawn wagon or buggy in the event the prices of automobiles were raised to exhorbitant figures. Outstanding examples on this point are found in the following antitrust cases:

(1) American Tobacco Co. v. United States,[29] where the defendant companies were found guilty of monopolizing the cigarette market. Naturally, there were many other forms of tobacco available to the tobacco users in the form of cigars, pipes, etc.

(2) United States v. United States Gypsum Co.,[30] where a specific type and kind of plaster board was involved. Other alternatives and substitutes of wall board and plastered lath were available to the public.

(3) United States v. Line Material Co.,[31] which had to do with a single type drop-out electric fuse. Many types of automatic circuit breakers as well as other types of drop-out fuses were readily available.

(4) Morton Salt Co. v. G. S. Suppiger Co.,[32] where salt tablets were involved. Obviously, salt in granular form could be substituted.

(5) United States v. Aluminum Co. (Alcoa)[33] which dealt with the aluminum market. Certain competition to aluminum was offered by copper, bronze and other light alloys.

Judge L. Hand indelibly drew the guiding line when he said:

"There are indeed limits to his [the monopolist's] power; substitutes are available for almost all commodities, and to raise the price enough is to evoke them. * * * But these limitations also exist when a single producer occupies the whole market; even then, his hold will depend upon his moderation in exerting his immediate power."

(6) Oxford Varnish Corporation v. Ault & Wiborg Corporation,[34] where a graining paste used in finishing wood to achieve a grained effect was in view. Of course, this paste was in competition with many varieties of paint and varnish, but it was held to be a definable subdivision of the varnish industry and thus capable of being unlawfully dominated.

(7) United States v. Klearflax Linen Looms,[35] which dealt with linen rugs. It is noteworthy that the sales of linen rugs constituted only about one-half of one per cent of the total sale of rugs in the United States; however, due to the special characteristics and properties of the linen rugs which rendered them desirable for particular purposes, they were adjudged a separate article of commerce or trade.

(8) Kobe, Inc., v. Dempsey Pump Co.,[36] which involved hydraulic pumps used in connection with removing oil from wells. Judge Pickett enunciated a principle in his opinion which is peculiarly applicable here, when he said:

28. Fn. 8, supra, 198 F.2d at page 423. See also, United States v. Yellow Cab Co., 1947, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010; Standard Oil Co. of New Jersey v. United States, 1910, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; Fashion Originators Guild v. Federal Trade Commission, 2 Cir., 1940, 114 F.2d 80, affirmed 312 U.S. 457, 61 S.Ct. 703, 85 L. Ed. 949.

29. 1945, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

30. 1947, 333 U.S. 364, 365, 68 S.Ct. 525, 92 L.Ed. 746.

31. 1947, 333 U.S. 287, 68 S.Ct. 550, 92 L. Ed. 701.

32. 1941, 314 U.S. 488, 62 S.Ct. 402, 86 L. Ed. 363.

33. 2 Cir., 1945, 148 F.2d 416, 425, 426.

34. 6 Cir., 1936, 83 F.2d 764.

35. D.C.Minn.1945, 63 F.Supp. 32.

36. Fn. 8, supra, 198 F.2d at pages 422, 423.

"First they say [the plaintiff] that they did not have the power to create a monopoly because their pump was in active competition with other types of pumps used for the same purpose. The record illustrates that there are in use a number of methods of lifting oil from wells. The sucker or rod pump, the electric pump and the gas lift method are those most commonly used. To some extent Kobe was in competition with the manufacturers of these types of pumps. Particularly in shallow wells, all the pumps may be used under identical conditions, but each method had advantages over the other under different conditions. It is agreed, however, and the court so found, that the hydraulic pump is particularly adapted for deep wells and in wells where the hole has not been drilled exactly perpendicular. The use of the rod type pump and the electrical pump becomes impractical at some of the extreme depths to which wells are now drilled."

By using this statement as a pattern, it could forcibly be argued that the roller *cone* rock bit makes up a definable and separate part of the trade or commerce as distinguished from the *cross-roller* rock bit.[37] The roller cone rock bit is used almost exclusively at the greater depths where the harder formations are encountered, although some true competition is given by the cross-roller bit at the more shallow depths.

Mr. Scott, director of research for plaintiff, in comparing the *roller cone* bit with the *cross-roller* bit made the following differentiation:[38]

"A. Well, when you compare the cone type with the cross roller bit, you get a longer run, there is less tendency of the bit to go flat while running in various formations. It cleans itself better."

Other evidence implies that the roller cone and cross-roller bits are not literally competitive.[39]

Mr. Montrose, vice-president in charge of sales for plaintiff, testified:[40]

"Q. Do you consider the Reed Roller Bit strick competition with Hughes? A. No.

"Q. Are you familiar with the construction and operation of what is commonly called the cross roller bit of the Reed Company? A. Only generally.

"Q. It is quite a different construction—A. Yes.

"Q.—isn't it, from the Hughes rock cone bit that is commonly manufactured by the Hughes Tool Company? A. Yes.

"Q. In fact, in most instances, it is not very competitive with the Hughes rock bits, is it? A. *In most areas, generally speaking, we don't think it is competitive.*" (Emphasis supplied.)

For many formations cross-roller rock bits are not considered satisfactory by the great majority of drillers.

Mr. Miller testified:[41]

"Q. How about as between roller cone bits and cross roller bits such as Reed makes, would you consider those two as competitive? A. In certain formations, yes.

"Q. Are they competitive in all formations? A. No, not in my opinion they aren't.

"Q. Can you distinguish for us the places where they would be competitive

---

37. Mr. Scott, plaintiff's director of research, testified that, "The majority of formations encountered in drilling oil wells seems to yield best to the *cone* type rock bit." (DX–20, p. 22.)

38. (DX–20, p. 31.)

39. Mr. Meyer, employee of plaintiff for 34 years, now in the sales and advertising department, when asked why Reed was not in as strong a position competitively now as in previous years, answered: "Your cross roller type bit— Reed with their cross roller type bit has had more competition to eat into them. They have Smith and Security and those folks making cross roller bits, which naturally took business away from Reed I would think." (DX–13, pp. 34, 35.)

40. (DX–24, p. 18.)

41. (R–253.)

with either one, could be used competitively and places where they can't be used in competition? (sic)

\* \* \* \* \* \*

"A. Well, soft formations or in some types of sand, shale, they are competitive, but in real hard formations they are not in my estimation."

However, Mr. Trigg testified: [42]

"Q. Why do you use the Hughes Bits? A. Well, we think they are the best bits, in most instances. In some places, they are not, I will say that, I think maybe in Stephens County where it is crooked hole country, we call it, there it is hard to keep the hole straight, we will use Globe or Smith *which has a flat bottom bit,* but just in normal drilling we will use a lot more Hughes bits then we do any other bits." (Emphasis supplied.)

■ At this time the Court believes that the roller cone and cross-roller rock bits are sufficiently interchangeable to be considered competitive and thus fall within the same "part" of trade or commerce. However, beyond controversy roller rock bits because of their design and function make up a distinct and definable "part" of commerce.[43]

## III

### The Plaintiff's Position In The Roller Rock Bit Industry

The roller rock bit industry, composed principally of two types of bits, the roller-cone and cross-roller, had its start shortly after 1900.

In the early 1920's the business custom of replacing worn cutter cones, worn cutter rollers, and worn bearings was an established rule; at that time it was a common practice to re-cut worn roller cones or roller cutters to provide new teeth on them.[44] In the early 1930's it became an established business practice to weld in many instances new teeth upon the cutter cones and rollers.[45] These repaired bits constituted an important part of the competition for business in this industry at that time.[46]

Throughout the years, and at the present time, the plaintiff's closest competitor in the sale of new bits has been the Reed Roller Bit Company.[47] This rivalry began in about 1915 when Clarence E. Reed, a former employee of the Sharp-Hughes Tool Company, the legal predecessor of plaintiff, began the business that eventually, in about 1919 or 1920, became the Reed Roller Bit Company.[48] Competition between these two companies was very keen up through the early 1930's, with Reed at times outselling the plaintiff.[49]

As mentioned, up until the early 1930's, the bits sold by both the plaintiff and Reed were constructed in such a manner that they could be disassembled and repaired with the teeth on the cutter cones or roller cutters re-cut or sharpened.

Although, new bits were leased or sold by the plaintiff, at the buyer's option, between about 1913 to 1915,[50] from 1915 until the early 1930's the plaintiff's bits were sold outright; during all of this time these bits were repaired, being furnished with new or re-cut cones by the plaintiff or other

---

42. (R–572.)

43. When Scott, director of research for plaintiff, was examined, regarding the pre-eminence of Hughes bits, he said: "I attribute its superior performance to geometry, that is, the cone type bit drills most formations quite satisfactorily." (DX–20, p. 24.) If there is such a distinction worthy of note as between the *cone* and other roller bits, even more so there is a marked distinction between roller rock bits generally and all other types of bits.

44. (Scott, DX–20, p. 7.)

45. (Sanders, R–500–504.)

46. Fn. 44, and 45, supra; (DX–28a–28k.)

47. Kuldell, former president and general manager of plaintiff company, testified that Reed was the only competition he ever recognized. (DX–9, p. 13.) Also, see (Meyer, DX–13, p. 34).

The plaintiff and Reed have their principal offices in Houston, Texas.

48. Chicago-Pneumatic Record, pp. 500, 591. (DX–7.)

49. (Meyer, DX–13, p. 19; Kuldell, DX–9, p. 31; DX–44b, 44f, and 68.)

50. (DX–71, p. 233.)

companies in the repair business.[51] In the early 1930's the general economic and competitive conditions became very severe; for several years the plaintiff operated at a loss,[52] and for a time lowered prices to the point that new cones were sold at the market price of re-cut ones.[53]

In about 1933 both the plaintiff and Reed altered their bit designs and produced bits that were no longer adapted for disassembly. These bits were known as "unitized" bits.[54] The plaintiff continued to manufacture "cone" bits and Reed continued to manufacture "cross-roller" bits, thus retaining the fundamental difference in design which had existed between the products of these two competitors from the outset.[55]

At the time the unitized bit came into prominence, the plaintiff started the practice of distributing drill bits under a "lease" agreement rather than selling them outright.[56] The lease agreement appears on the delivery ticket which is signed by the "lessee" when the bits are delivered at the rig; this agreement provides:

"Hughes roller rock bits and all core bit heads are never sold but are leased. When the original cutter teeth and/or bearing have served their useful life, the user will surrender the bits to Hughes Tool Company upon request. In accepting delivery, the user agrees not to surrender any of the tools mentioned above to other than duly authorized representatives of the Hughes Tool Company."

The evidence in this case establishes beyond question that since about 1936 the plaintiff has utterly domineered this industry.[57] At such time the Reed Roller Bit Company, the plaintiff's only major new bit manufacturer competitor, began to follow exactly the prices set by this plaintiff on all sizes of roller rock bits.[58]

The 7th Edition of the Oil Weekly published in 1936 indicates that on August 1, 1935, Reed changed the price of its rock bits in every comparable size of bit to correspond precisely with the prices charged by plaintiff.[59] This identical price setting becomes even more significant when it is recalled that the bits produced by the plaintiff and by Reed are fundamentally different in design and construction.

At about this same time the remaining new bit manufacturers, a small minority, began to follow the prices set by the plaintiff.

---

51. (DX–20, pp. 6–11.)

52. (DX–31a, 31b, 31c; Dietrich, DX–22, p. 33.)

53. (Meyer, DX–13, pp. 6–8.)

54. (Mobley, R–309, 310; Kuldell, DX–9, pp. 9, 10.)

55. The cross-roller cutter extends completely across and covers the complete bottom of the hole. The Reed-Humason cross-roller type is also distinguishable from the Hughes cone bit in that it is a flat bottom bit. (DX–PT–M.)

56. The use of the lease agreement in substantially its present form was begun in May of 1934. However, this was preceded by the practice begun in about January of 1932, of marking bits as "Property of the Hughes Tool Co." (DX–2[12].)

Although "leased" instead of sold the inventory records are treated as if the bits are sold, inasmuch as the inventory is reduced at the time of leasing. (Child, DX–12, p. 5; Garmany, DX–19, p. 13.)

57. As shown by the "competitive activity reports", the competition of Reed dropped off considerably by 1936. (DX–32a, 34d, 35, 38, 62.)

58. Presumably, at first, the Reed prices were different. (See last paragraph and written notation on DX–66.) Also, see (DXT–39a) which gives the Hughes lease price list for its rock bits effective May 25, 1934, the date of the lease agreement.

John Best, purchasing agent for Lucey Products Corporation, testified:

"Q. Do you know of any instances that there was a price war between Hughes and any of these other bit manufacturers in the past twenty years? A. You are asking a rather leading question.

"Q. Well, answer the question A. I will answer it this way, Hughes has established the prices. If anyone wants to meet their competition they meet it by equalling that price. (DX–27c, p. 49.)

59. (DX–30b, p. 1080.)

Seemingly, there was some agreement regarding these prices as Reed was reported to be "living up to this price increase one hundred per cent" (DX–33b, 1st par.).

This complete price control has continued up until the present time; the plaintiff has raised its prices at irregular intervals between 1936 and the present; Reed has consistently followed the plaintiff within twenty-four hours; and, the remaining minority manufacturers have followed within several weeks.[60]

A brief summary of the price changes in this industry reveals:

(1) that in 1936 there existed an exact agreement between plaintiff's and Reed's prices throughout the various range in sizes of bits.[61]

(2) that the next change in prices occurred when the plaintiff raised its prices on January 7, 1947; Reed followed on January 8th; H. C. Smith Tool Company followed on January 15th; Chicago Pneumatic Tool Company followed on February 1st.[62]

(3) that the next change in prices took place on July 24, 1948, when the plaintiff increased its prices; Reed followed on July 25th; Smith followed on August 1st; the other manufacturers followed soon thereafter.[63]

(4) that the next price increase in this industry occurred on December 1, 1950, when the plaintiff and Reed both changed prices on the same day; the other manufacturers followed at once.[64]

In this connection another factor strikes the Court with great force. The testimony is uncontradicted that a considerable amount of time and effort must be put forth before a price change can be effected; it is impossible to immediately bring about a change without painstaking research and preparation; the evidence further shows that the information regarding the date and amount of the price changes are carefully guarded and that the plaintiff changes its prices suddenly and without notice to the public;[65] the obvious purpose for being secretive is to prevent a rush by the bit purchasers to lay in store bits at the lower prices. However, an anomaly appears when an attempt is made to reconcile the above facts with the further fact that Reed, in spite of such secrecy, is able to change its prices to correspond with the plaintiff's prices within twenty-four hours from the time the plaintiff's changes are made public information.

Mr. Hamaker, vice-president in charge of sales for Reed, testifying by deposition, confirmed the fact that a great deal of time and effort of necessity must go into the preparation leading up to a price change, but went on to admit that the price which the plaintiff sets actually determines Reed's prices.[66] This pointedly illustrates the absolute dominance enjoyed by the plaintiff in regard to the fixing of prices in this industry.

The unlawfulness of being in a position of price control is capably described by Judge L. Hand in his opinion in the Aluminum Co. case:[67]

"* * * Starting, however, with the authoritative premise that all contracts fixing prices are unconditionally prohibited, the only possible difference between them and a monopoly is that while a monopoly necessarily involves

---

60. See (Kennedy, DX–27a, p. 24.)

61 Fn. 59 supra.

62. (DX–30a, 30d, 30e, 30f, 30g.)
 This 1947 change was a general repricing and not a fixed percentage increase. Regardless, it was followed exactly and immediately by Reed, and soon thereafter by the others.

63. (DX–30h, 30i, 30j); also, see testimony of Miller at (R–469–471).
 The 1948 change was a 12% raise in all bit prices. Reed followed Hughes exactly 24 hours later to the minute. See (Best, DX–27, pp. 43–47, and attached exhibits 1 to 4); also (McMahn, DX–27, pp. 64, 65, and attached exhibits 5 and 6.)

64. (DX–30k, 30l, 30m, 30n, 30o); See (Miller, R–469–471.)

65. See (Meyer, DX–13, p. 34) and Clarke, DX–18, p. 24); (Garmany, DX–19, p. 11.)

66. Mr. Hamaker originally testified that Reed takes a considerable amount of time in deciding upon a price change, with several executives carefully studying the labor and material costs (DX–25, pp. 9, 10), but subsequently admitted that Hughes' prices are the *sole governing factor*. (DX–25 p. 19.)

67. Fn. 33, supra, 148 F.2d at page 427.

an equal, or even greater, power to fix prices, its mere existence might be thought not to constitute an exercise of that power. That distinction is nevertheless purely formal; it would be valid only so long as the monopoly remained wholly inert; it would disappear as soon as the monopoly began to operate; for, when it did—that is, as soon as it began to sell at all—it must sell at some price and the only price at which it could sell is a price which it itself fixed. Thereafter the power and its exercise must needs coalesce. Indeed it would be absurd to condemn such contracts unconditionally, and not to extend the condemnation to monopolies; for the contracts are only steps toward that entire control which monopoly confers: they are really partial monopolies."

Thus, it is the *power* to control prices which the law forbids, regardless of whether such power is used to realize excessive profits. The plaintiff unmistakably has such power.[68]

The additional feature which makes the plaintiff's conduct even more reprehensible is that by these controlled price raises the plaintiff has increased its profits almost steadily from very little if any profit in the early 1930's to over 53% net profit of gross sales in 1951; thus, a net profit before taxes of over 53% was realized by the plaintiff on each bit sold in 1951.[69]

The actions of plaintiff and of Reed which have occurred repeatedly inescapably indicate that the plaintiff and Reed have a concerted scheme to fix prices on their bits; and, that in reality there is no *true* price competition between them; the inevitable result of the plaintiff's complete dominance is that from a business viewpoint Reed may have no other practical alternative.[70]

From the introduced evidence this Court holds a steadfast conviction that the plaintiff in fact has no other true price competition than that which arises from retipped bits; at this time quantities of dull bits and retipped bits are in interstate competition with new bits and continue to

68. In American Tobacco Co. v. United States, fn. 29, *supra*, 328 U.S. at page 811, 66 S.Ct. at page 1139, the Supreme Court said: " * * * The authorities support the view that the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so. * * *"

69. In response to defendant's interrogatory No. 1 (DX–2d) the plaintiff submitted to the Court the following profits before taxes, as a percentage of gross sales, from 1940 through 1951; these figures were prepared by Paul Garmany, plaintiff's accountant, and were taken from the plaintiff's books.

| | |
|---|---|
| 1940 | 30.8% |
| 1941 | 32.4 |
| 1942 | 23.4 |
| 1943 | 25.4 |
| 1944 | 26.4 |
| 1945 | 12.7 |
| 1946 | 32.3 |
| 1947 | 39.6 |
| 1948 | 42.2 |
| 1949 | 41.5 |
| 1950 | 48.4 |
| 1951 | 53.1 |

Also, in 1950 the plaintiff had an income of about $225,000 from the sale of dull

bits for their scrap metal value; from the evidence it is not clear whether this income is included in the above mentioned figures. (Garmany, DX–19, .p. 25.) Obviously, if such was not included the profit, realized by plaintiff was a little more than shown above. (See DX–64 for a comparison of Hughes' profits with those realized by other manufacturers.)

70. Of course, no collusion between the two companies is admitted. However, it is more than a coincidence that the plaintiff and Reed can both secretly spend a considerable length of time in preparation and then raise their prices simultaneously for identical amounts.

The casual opinion of Col. Kuldell, former president and general manager of the plaintiff company, in response to a line of questions dealing with the extent, if any, Hughes Company personnel cooperated with Reed, may approach the truth of the matter:

"A. I imagine that our sales manager, who was Mr. Brown, and theirs then was—wasn't it Rex Hamaker? I don't know who it was, but I am pretty sure that when one published a book of prices, whoever published his catalog first probably let the other one see it and said, 'This is what we are going to do. You

move in a somewhat restrained market at prices far below those of new bits.

That the plaintiff undeniedly is in a monopolistic position in the roller rock bit industry and that "retipped" bits offer the last vestige of price competition, is further verified by the plaintiff's own records dealing with the competitive picture of the industry from 1940 through 1950; although, admittedly such summaries are not, and could not be, absolutely complete, they are the most accurate and most dependable data in existence to establish this fact.[71] The following is a recapitulation of such records:[72]

| | New Bits | | | Retipped | | |
| Year | Hughes | Reed | Others | Hughes | Others | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 1940 | 129,458 | 27,137 | 7,747 | 10,877 | 1,682 | 176,901 |
| % | 73.3% | 14.1% | 4.0% | 6.0% | 0.9% | — |
| 1941 | 149,378 | 30,070 | 10,160 | 17,667 | 2,104 | 209,379 |
| % | 71.3% | 14.3% | 4.8% | 8.14% | 1.0% | — |
| 1942 | 98,110 | 23,678 | 5,043 | 11,698 | 1,589 | 140,118 |
| % | 70.0% | 16.8% | 3.5% | 8.3% | 1.0% | — |
| 1943 | 135,305 | 16,814 | 7,669 | 15,495 | 1,580 | 176,863 |
| % | 76.5% | 9.5% | 4.3% | 8.7% | 0.8% | — |
| 1944 | 195,753 | 29,976 | 10,729 | 23,612 | 2,160 | 262,230 |
| % | 74.6% | 12.0% | 4.0% | 9.0% | 0.8% | — |
| 1945 | 200,059 | 34,933 | 14,086 | 22,945 | 1,852 | 273,875 |
| % | 73.0% | 12.7% | 5.1% | 8.3% | 0.6% | — |
| 1946 | 214,594 | 29,420 | 19,940 | 28,479 | 1,886 | 294,322 |
| % | 72.9% | 9.9% | 6.7% | 9.6% | 0.6% | — |
| 1947 | 267,930 | 36,769 | 31,454 | 28,144 | 2,975 | 367,272 |
| % | 72.9% | 10.0% | 8.5% | 7.9% | 0.8% | — |
| 1948 | 334,333 | 33,014 | 39,144 | 34,576 | 4,495 | 445,562 |
| % | 75.0% | 7.4% | 8.7% | 7.7% | 1.0% | — |
| 1949 | 349,763 | 33,110 | 46,303 | 43,854 | 7,283 | 480,313 |
| % | 72.8% | 6.8%. | 9.6% | 9.1% | 1.5% | — |
| 1950 | 430,220 | 40,525 | 42,252 | 50,756 | 5,968 | 569,721 |
| % | 75.5% | 7.1% | 7.41% | 8.9% | 1.05% | — |

can do what you want to about it' * * *."

Kuldell went on to say:

"A. I am sure they discussed business all the time. They were very close friends, too. * * *" (DX–9, p. 39.) Significantly, it has always been Hughes who first published the catalog, or at least who first raised the prices.

71. Other evidence corroborates the fundamental accuracy of these summaries showing percentage of new bit sales by the plaintiff.

(1) "Q. Do you know, Mr. Hyatt, of any better way to get an overall picture of the rock bit competition of Hughes than the one that you use at the present? A. No, I don't know of a better way. If I did, why, we sure would like to know about it." (DX–18, p. 85.)

(2) John Best, purchasing agent for the Lucey Products Corporation, testified that from the billings he has handled he would estimate that the plaintiff had between 75% to 80% of the total bit business. (DX–27c, p. 43.)

(3) W. G. Rudd, Sales Manager for Lucey Products Corporation, estimated that of all the bits invoiced in the common size, 75% would be plaintiff's. (DX–27d, p. 55.)

(4) R.M.McMahan, Secretary of the Bovaird Supply Company, testified that plaintiff had "five to eight times as much as the Reed Roller Bit," and "four to seven times as much as all the others put together." (DX–27e, pp. 66, 67.)

(5) J. W. Garr, driller in Oklahoma and Texas, testified that about 90% of his bit business goes to the plaintiff. (R–480.)

(6) Meyer, in his testimony, confirmed that plaintiff sold over 90% of the bits used in drilling deep, hard formations. (DX–13, p. 36.)

72. The early competitive activity reports

Thus, in 1940 out of approximately 177,-000 bits used, the plaintiff sold about 129,-500 of them or 73.3%; this supremacy has continued up through 1950 wherein out of about 570,000 bits used, the plaintiff sold over 430,000 of them. From this résumé it also appears that in 1950 plaintiff's retipped bits used amounted to over 10,000 more than the total number of new bits sold by Reed, the plaintiff's largest new bit competitor; it is manifest that such retipped bits, although not large in amount percentagewise, which sell for about $40 each, constitute the last true price competition confronting the plaintiff's new bits, the most popular size of which sells for about $160.[73]

Although, counsel for plaintiff has somewhat questioned the fact that "retipped" bits are literally in competition with new bits in the roller rock bit industry, the Court cannot take such a contention too seriously.[74]

Mr. Montrose, vice-president in charge of sales for plaintiff, disclosed that from a selling standpoint the retipped bits were *strictly* competitive.[75]

Also, one of the most probative pieces of evidence establishing that retipped bits are competitive comes from the plaintiff's own records, which in effect amounts to an admission; for ten years the plaintiff kept an accurate count of all retipped bits used, along with new bits used, and headed up such compilations "Competitive Activity Report Summaries."[76]

From the general competitive viewpoint not only has the plaintiff's *hold on the bit market from the standpoint of number of bits sold percentagewise* gradually increased, but as shown by the figures previously referred to the number of bits used yearly during the ten year period between 1940 and 1950 has increased over threefold. This is all the more startling when it is realized that the plaintiff's profit per bit increased from 30.8% to 53.1% of the individual bit selling price during the very time of this tremendous increase in volume of business.

The Court is an enthusiastic adherent of our American philosophy of free-enterprise; and, has absolutely no sympathy for that minority which take the position that the capital investor should not receive a fair recompense for his financial investment and for the application of his per-

---

establish that even prior to 1940 the plaintiff had around 70% of the business in the roller rock bit industry. (DX-32a, 32b, 34d, 38.)

73. This by implication illustrates the tremendous financial advantage enjoyed by the plaintiff over its competitors. On the 430,000 odd bits sold by plaintiff in 1950, its gross income doubtless approached $68,000,000; its net profit, before taxes, doubtless exceeded $34,000,-000. Unquestionably, size in and of itself does not violate the antitrust statutes; however, size is a pertinent consideration along with other evidence which tends to prove exclusion of competitive sales and price control. See United States v. Swift & Co., 1932, 286 U.S. 106, 116, 52 S.Ct. 460, 76 L.Ed. 999.

74. Mr. Dietrich, executive-vice-president of plaintiff, in giving his deposition, said:
"Q. This retipping competition being so negligible, is it profitable to bring suit? A. I don't know that it has ever been termed negligible. At a time when it might be termed negligible, it could be a threat to us.

"Q. A threat to what? A. A threat to our business.
"Q. A decrease in your business? A. Yes, a threat to our volume." (DX-22, p. 23.)

75. (DX-24, p. 9.)

76. (DXT-28a-28m) A further indication lies latent in the fact that Mobley induced C. F. Williams to "lay off" retipping bits for a short period in 1947, on the promise that if Hughes licensed this activity, Mobley would recommend Williams as one of plaintiff's agents. (DX-6, p. 104.)

Judge Wyzanski in United States v. United Shoe Machinery Corp., D.C.Mass. 1953, 110 F.Supp. 295, 344, in analyzing the dominant position held by United Shoe and in pointing out the market weaknesses said among other things, "*And, finally, there is no substantial substitute competition from a vigorous secondhand market in shoe machinery.*" (Emphasis supplied.)

sonal ingenuity. Our economy is bottomed upon the sturdy conviction that the aggressive entrepreneur deserves liberal compensation where his rugged individualism has resulted in raising our standard of living or in creating a new commercial demand. The Court has no disposition to discourage the very heart-beat of our way of life by approaching the question of permissible profit in a miserly fashion. However, by any norm used, the exorbitant profit realized by the plaintiff corporation, can in no way be justified. The Court seriously questions whether any person, associated with or removed from the plaintiff company, can in the utmost of *good faith* urge that such excessive profit is the plaintiff's logical reward for having given a fine product to the oil and gas industry. Such a stand makes sheer mockery out of the true goal and purpose of our capitalistic system,—the perpetuation of "free competition".

## IV

### The Lease Agreement

The plaintiff's absolute domination of the roller rock bit industry has been achieved and maintained by intensive engineering research, an aggressive patent policy coupled with wide-spread patent litigation, an abusive use of the "lease" agreement, an invasive sales policy and an embracing of each opportunity for expansion with such readiness as to discourage competition.

Of the means just enumerated the zealous and abusive use of the "lease" agreement has been one of the most effective.[77]

This "leasing" by the plaintiff has a twofold object and result.[78]

(1) It enables the plaintiff to make certain that the majority of such bits are never repaired and used again in competition with the plaintiff's new bits.

(2) It permits the plaintiff's field organization to pick up the used bits of plaintiff's manufacture, examine them, and return some to plaintiff's laboratory in Houston for further examination, including physical, metallurgical and chemical analyses.

The Court has not ignored or by this opinion attempted to ride roughshod over the many previous decisions which have held the "lease" agreement to be a lawful and legitimate business device.

The "lease" agreement was held to be valid in Robertson Rock Bit Co. v. Hughes Tool Co. in which the Court said: [79]

"As to the leasing agreements and the practices of recovering used bits under them, the district court properly held them valid."

In Williams v. Hughes Tool Company [80] Chief Judge Phillips in his well-reasoned opinion said:

"The reasons which motivated Hughes in leasing, rather than selling its bits, and in requiring the return thereof for inspection, testing and research are obviously to enable Hughes to improve the quality of its bits, to provide the proper bit for drilling in particular formations or in a particular area, to provide valuable information to drillers who use the Hughes bits, to maintain the high standard of its products and protect their reputation. Failures of retipped bits would tend to in-

---

77. Plaintiff in its argument has questioned the defendant's right, as a third person not a party to the lease agreement, to challenge its validity. Certainly, no privity of contract need exist. Any person injured as a result of the violation of the anti-trust laws has a right to challenge the violator together with the violator's methods which have been used to bring about such injury.

78. The Reed Roller Bit Company and many other minority new bit manufacturers have followed the same practice of leasing bits which plaintiff originated; as a result competition from repaired

bits has been reduced to a very low figure. Even prior to the time that other minority manufacturers began this practice, inasmuch as the plaintiff and Reed had the lion's share of the new bit business competition from the repair source was effectively suppressed.

79. 5 Cir., 1949, 176 F.2d 783, 785. Cited with approval in Williams v. Hughes Tool Co., fn. 2, supra, 186 F.2d at page 281. Certiorari denied 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342.

80. Fn. 2, supra, 186 F.2d at page 285.

jure the reputation of Hughes' bits. The lease agreement and the practice of recovering used bits, as stated by the Fifth Circuit in Robertson Rock Bit Co. v. Hughes Tool Co., supra, is practical, reasonable and fair."

In the second Williams case [81] Judge Bratton went on to say:

"Williams presents only one specification of points for reversal of the challenged order. Its substance is that since the patents have expired there is no justification for continuing the injunctions restraining Williams from interfering with the property rights of Hughes in its leased bits by retipping or rebuilding the teeth thereon. * * * It is admitted frankly in the brief of Williams that if these two features of the injunction had been completely separate and independent holdings, the expiration of the patents would not affect the feature relating to interference with the property rights of Hughes in its leased bits by retipping and rebuilding teeth thereon. But the two features of the injunction were separate and independent. The equitable right of Hughes to protection against infringement of its patents was quite separate and apart from its system of leasing its bits rather than selling them. Hughes was entitled to restrain infringement of its patents whether the bits had been leased or sold. And if the practice of Williams in receiving from lessees bits manufactured by Hughes, retipping them, and building

new teeth thereon, constituted systematic encouragement to lessees to breach valid and effective provisions in the leasing agreements, Hughes was entitled in equity to restrain such wrongful conduct without regard to whether the bits were manufactured under patents or not. The two rights were separate and distinct. Neither was dependent upon the other. Neither was an adjunct of the other. * * *"

 These decisions establish beyond controversy that the "lease" agreement in and of itself is not illegal but *may* be a perfectly proper means of maintaining control over a manufactured article where the owner does not wish to sell outright. Also, these previous holdings find in effect that from the evidence introduced at the various trials there was no convincing evidence that the Hughes Tool Company was operating in violation of the antitrust laws.

Not only is this Court bound by these decisions of the Court of Appeals of this District, but in fact has no criticism to make of the results reached therein.

However, the Courts previously have not had the benefit of the evidence placed before this Court, in the instant case, resulting in proof of the complete dominance enjoyed by the plaintiff in the roller rock bit industry. It is elementary that a lawful instrument, such as the lease agreement has heretofore been found to be, cannot be used to realize an unlawful end, such as a violation of the antitrust laws.[82]

81. Williams v. Hughes Tool Co., 10 Cir., 1952, 199 F.2d 862, 863.

82. In the recent United Shoe Machinery case, fn. 76 supra, 110 F.Supp. at page 344, where a somewhat analogous lease arrangement was in view, the Court had this to say: " * * * Much of United's . market power is traceable to the magnetic ties inherent in its system of leasing, and not selling, its more important machines. * * * In one sense, the leasing system and the miscellaneous activities just referred to * * * were natural and normal, for they were, In Judge Hand's words, 'honestly industrial'. 148 F.2d at page 431. They are the sort of activities which would be engaged in

by other honorable firms. And, to a large extent, the leasing practices conform to long-standing traditions in the shoe machinery business. Yet, they are not practices which can be properly described as the inevitable consequences of ability, natural forces, or law. They represent something more than the use of accessible resources, the process of invention and innovation, and the employment of those techniques of employment, financing, production, and distribution, which a competitive society must foster. They are contracts, arrangements, and policies which, instead of encouraging competition based on pure merit, further the dominance of a particular firm. In this sense, they are unnatural

As pointed out by Justice Burton in the American Tobacco Co. case: [83]

"It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."

As mentioned by Mr. Chief Justice White in Standard Oil Co. v. United States: [84]

" * * * practical common sense caused attention to be concentrated not upon the theoretically correct name to be given to the condition or acts which gave rise to a harmful result, but to the result itself and to the remedying of the evils which it produced."

With no persuasive evidence of a violation of the antitrust statutes the previous Courts could, entirely consistent with the fundamental concepts of our law, recognize the validity, in and of itself, of the lease agreement.

However, once a Court, such as here, is literally flooded with a maze of testimony and other evidence leading to the inevitable conclusion of monopoly it is then a rather simple,—almost automatic, deduction to identify the vehicles used to arrive at such monopoly.[85]

Three pivotal points, from the position of introduced evidence, distinguish the effect and character of the evidence in the instant case from all other cases which previously involved the plaintiff herein.

(1) The Court for the first time has been shown beyond dispute that the plaintiff is selling 75% or more of all the roller rock bits used in drilling today.[86]

(2) The Court for the first time has been shown, from the plaintiff's own books, that in 1950 on over 430,000 bits sold the plaintiff realized a profit of 48.4% per bit; and that this profit was increased to 53.1% per bit in 1951.

(3) The Court has had the benefit of the testimony of a former executive in the plaintiff corporation who was closely associated with the object and use of the plaintiff's lease agreement. This former employee has given plausible testimony on the true object and purpose of the lease

barriers; they unnecessarily exclude actual and potential competition; they restrict a free market. *While the law allows many enterprises to use such practices, the Sherman Act is now construed by superior courts to forbid the continuance of effective market control based in part upon such practices. * * * "* (Emphasis supplied.)

83. Fn. 29, supra, 328 U.S. at 809, 66 S. Ct. 1139.

84. 1911, 221 U.S. 1, 56, 31 S.Ct. 502, 514, 55 L.Ed. 619. *Also, in United States v. Besser Manufacturing Co.,* D.C.Mich. 1951, 96 F.Supp. 304, 313 the court said: "While it must be admitted that not all of these acts are prohibited, nevertheless, we must view them in the broad panorama of other acts and their association with each other to note, not only the effect—but to pierce the veil for evidence of intent." [Citing cases.] Affirmed 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063.

85. In United Shoe Machinery case, fn. 76, supra, 110 F.Supp. at page 323, the Court said: "The effect of United's leasing system as it works in practice may be examined from the viewpoints of United, of the shoe manufacturers, and of competitors potential or actual. * * * (c) United's lease system makes impossible a second-hand market in its own machines. This has two effects. It prevents United from suffering that kind of competition which a second-hand market offers. Also it prevents competitors from acquiring United machines with a view to copying such parts of the machines as are not patented, and with a view to experimenting with improvements without disclosing them to United."

86. 75% actually is a very conservative figure. DX–28k shows that in 1950 the plaintiff sold 75.5% of the roller rock bits used, included in this competitive figure were Hughes retipped bits which accounted for an additional 8.9%. Eliminating the retips from consideration readily shows that the plaintiff is actually selling between 80 and 85% of all *new* roller rock bits sold.

agreement, heretofore not disclosed to the Courts.[87]

 Unquestionably, as previously found by the Courts, the plaintiff used the lease agreement to aid in analyzing and improving its product.[88] However, this is not the primary purpose of the lease agreement. This Court is satisfied that the paramount aim of the lease agreement as used by the plaintiff was to promote sales rather than to achieve engineering perfection.[89]

The evidence indicates that the plaintiff in thinking of a new method of marketing, sent Mr. Mobley, a young lawyer, to work with Mr. Brown, the vice-president *in charge of sales*.[90] Mobley was then sent into the field to do investigative work and report his results, particularly to Mr. Brown, in order to provide sufficient information for the new plan or program.[91] Mobley reported his field investigations to Col. Kuldell, general manager, and to Brown; the three of them then made the final decision regarding what to do. Mobley was consulted on the policy of the company respecting the new distribution scheme; a policy was determined to retain control over the bits for the purpose of preventing rebuilding of the bits, as distinguished from a mere policy to get the bits back.[92] The reason for this action was to control the dull bits to prevent them from being repaired and entered into competition with new bits, rather than to protect the plaintiff's reputation or to further the plaintiff's engineering research. Mobley was primarily associated in his work with sales

87. The plaintiff has forcibly argued that the testimony given by Mobley is unacceptable inasmuch as (1) much of it is in the nature of hearsay and (2) all the information acquired was gained while he occupied the relationship of attorney-client and that consequently is privileged.

The first contention can be disposed of by the Court merely giving its assurance that no testimony in the nature of hearsay was relied upon by the Court. The second contention is much more serious. The Court diligently appraised the assertion that Mobley in testifying was guilty of a breach of ethics and gave evidence based upon privileged communications from a client. However, it must be noted that although Mobley possessed a legal degree and represented the plaintiff as an attorney in certain routine replevin and sequestration actions, that he was primarily an executive aiding in the promotion of sales and working closely with the sales department. (Kuldell, DX–9, p. 30) Although, doubtless, his legal background was helpful, he was strictly an employee, in the field, a good part of the time. While upon the witness stand Mobley evidenced a sincere desire to not breach any moral duty owed the plaintiff from a professional standpoint, but convincingly indicated that his testimony was not based upon information received as a lawyer, in the common use of the term, but from knowledge obtained as a regularly salaried non-professional business employee. (Read R–280–300.)

88. This same observation and study could easily be made by the plaintiff without technically retaining title to the bits. The majority of the bits examined are examined in the field. All the drillers which testified readily agreed that the plaintiff could have free access to these used bits, regardless who held technical title. Furthermore, it is sigificant that not over one to two per cent of the bits run go back to Houston. (Payne, R–88, 89.)

As observed by Judge Huxman in his dissent in the first Williams case 186 F. 2d at page 287: " * * * It is conceded * * * that only a small per-cent of the bits are capable of being re-tipped. Permitting retipping of this small number of bits would in no wise interfere with any analytical operations appellee [Hughes] might wish to conduct." (Fn. 2, supra.)

89. Mr. Ayers, senior vice-president of the plaintiff, indicated that the purpose of the lease was to do away *completely* with retipping. (DX–6, p. 132.)

The clear import of Mobley's testimony is that the sole purpose of the lease is to *control* the bits for the sales department, and had little or nothing to do with engineering research. (R–323. Also, see R–294, 296.)

Col. Kuldell testified that Mobley and the *sales manager* Brown formulated the lease agreement (DX–9, p. 29); Mr. Meyer corroborated the fact that the sales department originated the lease agreement. (DX–13, p. 19.)

90. (Mobley, R–282, 284, 294.)

91. (Mobley, R–282, 283, 287, 323.)

92. (Mobley, R–296; Kuldell, DX–9, pp. 30, 31.)

548

manager Brown and general manager, Kuldell; and, his contact with the engineering department was merely incidental.[93]

The factual information which Mobley obtained in the field convinced plaintiff's management that the lease agreement was necessary to prevent the competition from rebuilding or reconditioning bits in some way; in this there was no thought regarding engineering research, but it had "all" to do with sales competition.[94]

Mobley was given very broad latitude in working with the sales force to develop the lease idea to the utmost.[95] The only reason the lease agreement did not expressly preclude rebuilding was because in the early stages of the lease agreement this leasing was unpopular and the general resistance, which already existed, would have increased to the point that sales would have been seriously impaired.[96]

To exclude *retipping* competition, Mobley's activities in the field were directed to in every-way build up the tradition of the lease agreement so that absolute control over the used bits was retained.[97] Many actions of sequestration and replevin were brought by the plaintiff against the individual retippers in order to drive the retippers "to the bushes", take their business off the front street to the back street."[98]

After the war the plaintiff reactivated its field force for the purpose of stopping retipping. A special assignment department with Mobley at the head was organized.[99] The objective of this special department, from 1946 until 1949, was to locate and pick up *dull bits* of the plaintiff's manufacture, particularly dull bits which were in the possession of persons other than the original lessees.[1]

93. (Mobley, R–281, 282, 295, 296, 323.)
94. (Mobley, R–323.)
95. (Mobley, R–346.)
96. (Mobley, R–344.)
97. (Mobley, R–294; Scott, DX–20, p. 13; Kuldell, DX–9, pp. 29, 30.)

There is testimony that the plaintiff's senior vice-president, Mr. Ayers, considered the department under Mobley's supervision after 1939 as a special police force department; that this police force took advantage of every incident that could be used to libel or slander the small retipping operation; any minor incident that might damage the plaintiff's reputation, regardless how small, would be highly publicized and exaggerated to help justify plaintiff's opposition to retipping and thus bring about the planned program of the plaintiff. (Mobley, R–325.)

There is testimony that the plaintiff's sales manager conceived the idea that it would help plaintiff to have the field personnel of plaintiff aid peace officers to recover stolen bits (Mobley, R–361, 362); that Brown considered it not only a good idea to stop thieving, but in taking such bits back to the contractor, it gave the plaintiff's salesmen an opportunity to sell the idea that *retippers* were stealing bits; and, that this idea aided the plaintiff considerably. (Mobley, R–361, 362.)

98. Some of the sequestration actions brought in the District Court of Wichita County, Texas, were: (1) Roy W. Dickey, defendant, No. 43,080–A, 1947 (DX–7, p. 812); (2) J. W. Ross, defendant, No. 43,189–A, 1947 (DX–7, p. 816); (3) J. H. Bingham and Carl C. Kennett, defendants, No. 43,184–A, 1947 (DX–7, p. 815); (4) L.R. Bowers, defendant, No. 43,834–A, 1947 (DX–7, 817); (5) Harry A. Adams, defendant, No. 43,849–A, 1947 (DX–7, p. 818); (6) J. H. Bingham, defendant, No. 43,850–A, 1947 (DX–7, p. 819); (7) Raymond Graham, defendant, No. 43,837–A, 1947 (DX–7, p. 819).

Replevin actions brought in the District Court of Oklahoma County, State of Oklahoma, include: (1) Allen Leeper, an individual, doing business as the Wabash Welding Co., defendant, No. 115209, 1947 (DX–7, p. 1207); (2) Herman R. Metcalf, d/b/a Oil Field Welding Service, and Lynn Doxcie, defendants, No. 117598, 1947 (DX–7, p. 1214); (3) O. E. Bacon, James F. Gore and Bill Lepper, defendants, No. 117118, 1948 (DX–7, p. 1223); (4) Allen Leeper, an individual, doing business as the Wabash Welding Co., defendant, No. 115288, 1948 (DX–7, p. 1233); (5) Keith Kritton, d/b/a Kritton Welding Service, defendant, No. 117597, 1948 (DX–7, p. 1243). Also, a replevin action was brought in the District Court of Payne County, Oklahoma, against B. F. Conaghan, d/b/a Conaghan equipment, and H. G. Ladd, defendants, No. 15,203, 1947 (DX–7, p. 769).

99. Ayres, DX–6, p. 131; Hays, DX–14, p. 6.)

1. (Hays, DX–14, pp. 5, 6; Also, read p. 11.)

## The Enforcement Of The Lease Agreement

The retipping of bits, as such, began to flourish about 1937.[2] Not only did small welders take part in this activity, but a number of the large oil companies[3] and independent drilling contractors began to take advantage of the savings which could be made by using retipped bits.[4]

Included in the group of drilling contractors using retipped bits were prominent drillers such as Olsen, Noble, Mabee, Jones and Loffland.[5] In fact, the plaintiff's competitive activity report of January, 1939, shows that Noble and Loffland, the two largest contractors, were the two worst offenders.[6]

Mr. Garr, a drilling contractor of Oklahoma City, drills in Oklahoma and Texas; in the past he has drilled in the mid-continent area for many major companies, including Sinclair and Continental. He uses about 25 to 30% retips of Hughes dull bits and other manufacturers. Garr has retipped since 1941 with plaintiff's knowledge and plaintiff has never brought suit.[7] Garr has his own retipper and has used other retippers; the plaintiff has never complained to Garr about any of the leased bits being retipped.[8]

Jim Stephens, drilling superintendent of Phillips Petroleum Company, testified that Phillips is familiar with the lease agreement but has continued to retip with plaintiff's full knowledge and acquiescence.[9] He excuses this technical violation of the lease agreement upon the ground that Phillips, as a practical matter, is entitled to get all the economical service out of the bits, whether bought or rented; he considers retipping to be merely a repair of a rented tool.[10]

Fred Morgan, Oklahoma City drilling contractor, does most of his work in Oklahoma. Although familiar with the lease agreement, Morgan has been using about 25% retips for years; and, the plaintiff has never attempted to enforce the lease agreement against him.[11]

Joe Miller, a drilling contractor since 1906, testified he has used about 80 to 90% Hughes' bits since 1933, and, that he has used about 30% retipped bits. Miller testified further that he was *once* threatened by an employee of plaintiff but nothing was ever done.[12]

---

Apparently, the plaintiff did not so vigorously oppose retipping during the war years as at other times because of the labor and material shortage; the plaintiff had great difficulty in keeping up with orders and worked a great deal of overtime. (Mobley, R–407.) Obviously, for the time, it was to the plaintiff's advantage to permit retipped bits to help fill the need.

2. (DX–32a, 32b, 33b).

3. (DX–32b, p. 2, 3; DX–33a; Mobley, R–347, 349; DX–53a, 1st par.; DX–38; DX–46; DX–62.)

4. As an example of the economic saving involved where retipped bits are used and to emphasize that retipped bits are *strictly* competitive, the testimony of Joe Trigg, well established drilling contractor, is very interesting. Trigg owns eight rigs; he drills for large oil companies like Sinclair, Tidewater and Phillips, and has a "bit cost" of around $200,000 a year. He testified that he uses from 10 to 22½% of retips in his drilling operations and estimates he has saved about $30,000 a year on his bit cost by doing so. (R–551, 567, 574.)

5. (Mobley, R–347; DX–33a, 33b; DX–62.)

6. (DX–62.)

7. (Garr, R–479–483.)

8. (Garr, R–497) In response to a question by the Court Garr stated that the plaintiff does not always pick up the same number of dull bits as new bits delivered inasmuch as if Garr wants to retip some of the bits he does so. (R–488.)

9. (R–450, 454.)

10. (R–455) Phillips tool pushers have told the field men of plaintiff they could not pick up dull Hughes bits which Phillips wanted to have retipped. (R–455.)

11. (R–671, 675) In response to a question by the Court Morgan stated that plaintiff has continued to lease him bits even though plaintiff for 10 years has known Morgan to be retipping dull bits. (R–677.) Morgan, also, testified he has saved around $100,000 throughout the years by using retipped bits.

12. (R–249) Miller testified further that practically every driller uses retipped

550

Joe Trigg, drilling contractor, testified that he retips dull bits of plaintiff which he has obtained under the lease agreement and that the plaintiff has lodged no objection. In all the years that Trigg has been retipping the plaintiff has never sued him for patent infringement or for violation of the lease agreement, although the plaintiff was well aware of his retipping activities.[13]

No legal action was brought, or even threatened, against such large oil companies as Gulf, Carter and Magnolia, during the very time they were doing a great deal of retipping;[14] many of the companies continued to retip without any threat of legal action by the plaintiff. Magnolia, for example, had three retippers working constantly in the West Texas area; at this same time Gulf and Carter were also retipping, and the plaintiff never threatened any of them with court action.[15] Furthermore, Skelly Oil Company, Phillips Petroleum Company and numerous other oil companies *have been* for a number of years and *still are* retipping dull bits; although, the plaintiff has attempted to discourage such activity in every way possible no legal action has ever been suggested to these large purchasers of the plaintiff's product, who are well aware of the existence of the lease agreement.[16]

The fact that the plaintiff has never enforced its lease agreement through legal channels against any of these large purchasers of new bits, but only against the small independent retipper, again emphasizes that the lease agreement is being used primarily to further sales rather than to advance the workmanlike quality of the bits.[17]

If the lease agreement had been brought into being for the sole purpose of aiding the plaintiff engineering-wise and if the plaintiff had been firmly convinced of its right and title to the leased bits, the lease agreement should have been enforced in an undiscriminating manner against any and all violators; obviously, the most desirable and helpful engineering information could be gained from the heavy purchasers and users of the plaintiff's bits.

The resultant effect of failing to use the lease agreement to suppress retipping activity is vividly pointed out by a study of the sales in the Illinois area, from the plaintiff's own "competitive activity" reports.[18] For some reason the Illinois retippers were left unmolested, relatively;

---

bits of Hughes and other manufacturers and that he knows of no one who at some time hasn't used retipped bits; such has been a common practice throughout the oil industry. (R–250, 251.)

13. In one instance, plaintiff brought a replevin suit against Clint Williams of Tonkawa for some of Trigg's bits which Williams had obtained from Trigg for retipping in 1949 or 1950; however, Trigg got them back immediately without ever going to trial. (R–557, 558.)

14. (Mobley, R–398) Magnolia refused to quit retipping and upon threatening to quit purchasing new bits of plaintiff, Brown backed off because Magnolia was a good customer. (Mobley, R–352.)
 Mobley and sales manager Brown went to Humble Oil Company after the advent of the lease and persuaded them to stop retipping. However, Gulf was retipping and did not stop until about 1946. (Mobley, R–347, 349.)

15. (Mobley, R–398, 399; Haight stipulation, R–665.)

16. (Mobley, R–353, 354; Stephens, R–452; Garr, R–480–485; Trigg, R–555–559, 567–568; Morgan, R–671, 675.)

17. In answer to a question by the Court on whether the field men of plaintiff informed the purchaser that he was signing a lease agreement, Mobley testified that the representatives of the plaintiff did not dare go that far; and, that the plaintiff never insisted that a purchaser sign under threat of not receiving more bits from the plaintiff, unless he was a very small purchaser. (R–352.)

18. Mobley, in testifying on the number of bits sold in Illinois, referred to DX–29 and explained that the plaintiff in 1940 sold in excess of 33,000 bits, which was 73% of the total used in Illinois that year. From 1941 through 1945 plaintiff's total bit sales were decreasing slightly, but the drilling operations were not diminishing. (R–400.) He went on to testify, referring to DX–29, that in 1940 retipping was 19.56% of the total numbers of bits used, and gradually increased through 1945 until it reached 33.9% of the total bits used.

as a consequence the competition of retipped bits arose to as high as 35 to 40% of the total bits used in that territory; this is in sharp contrast with the West Texas area where the lease agreement was rigidly enforced and where retipping never exceeded about 3% of the total number of bits used.[19] Doubtless, the difference in drilling formations had something to do with this wide disparagement in the competitive figures.[20] However, it is also evident that not only is the retipper in direct competition with the new bit manufacturer, but it is further clear that the enforcement of the lease agreement is the primary means by which this competition from the retipper is suppressed.

The effectiveness, saleswise, of the enforced lease is aptly illustrated by the content of a letter written by the plaintiff's Illinois salesman to the plaintiff's sales manager which stated that it would be a good idea to have Mobley come to Illinois and do something about the retipping because the "one-horse outfits" were already half scared and held down as much as possible.[21] This same salesman later wrote that the plaintiff ought to do something about the retipping in Illinois and suggested that an "example" be made of some of the welders.[22] Again, it is obvious that there is little connection between engineering research and the practical use to which the lease agreement is put. This history of limited enforcement merely corroborates the testimony of Mobley on the true purpose behind the lease agreement.

■■■ The plaintiff has used the Courts to protect it from competition from repaired and retipped bits, by bringing suits against those who were in direct competition with the plaintiff who were not purchasers of the plaintiff's product; thus,

this specific source of competition, the second-hand bit market, has been not only held in check but has been gradually eliminated. Hand in hand with this direct attack through the Courts, the plaintiff has indirectly discouraged users of retipped bits, who also purchase new bits from plaintiff, from the continued use of retipped bits in all instances where mere persuasion, short of the threat of legal action, held any opportunity for success.

The inevitable result has been not only to radically suppress competition from the independent repairmen and retippers, such as the defendant herein, but has been to discourage companies and drillers from retipping in view of court decisions holding such to be in violation of the law. Significantly, as the plaintiff's position in the roller rock bit industry became more dominant the plaintiff has become progressively more insistent that the sanctity of the lease agreement not be impinged. This Court will not legitimize these unconscionable business tactics which have resulted in the reaping of inordinate profits.

## V

Factors, Other Than The Lease Agreement, Which Have Enabled The Plaintiff To Obtain And Maintain Its Position Of Dominance

■■■ The plaintiff's position of dominance has not been attained per chance but has been the direct result of an intelligently planned and perfectly executed business policy; many of the individual acts could not, in and of themselves, be considered unlawful; in fact, when viewed individually, many of the plaintiff's acts have been commendable and would be praised from a practical business view-

---

19. (Mobley, R–356–357.)

20. After 1940, in the West Texas field the percentage of new Hughes bits sold was always above 80%; however, retipping of dull Hughes' bits was never permitted to exceed 2.5% for West Texas; (Mobley, R–403) and, Hughes worked hard to keep it "clean". (Mobley, R–404, 495) The West Texas field has a harder and deeper formation than in Illinois; however, down to about 3000

feet the bit usage is about the same. (Mobley, R–403, 404, 413.)

21. (DX–34a, DX–34b, 34c, 72–c, p. 3.)

22. (DX–34d, under "Remarks". With the exception of Illinois, retipping would come and go, and if it became important in an area, and the plaintiff did not want retipping to make headway, they would work diligently to suppress it. (Mobley, R–494–495.)

point.[23] However, when all such acts taken together result in a company arriving at an unlawful position of business control, then such acts cease to be commendable; they are not even acceptable. Some of the factors, other than the abusive use of the lease agreement, previously discussed, which have brought about the plaintiff's violation of the antitrust laws are:

(1) *An intensive scientific and engineering research and development program.*

This is an outstanding example of intelligently planned action which obstensibly contains many admirable features.

A portion of the testimony of L. L. Payne, the then assistant-chief engineer of plaintiff, in the first Williams case gives a graphic picture of the thoroughness with which the plaintiff has handled its development program:[24]

"The Hughes Tool Company has seven major divisions in the United States. The new bits are kept either in the divisions warehouses or in branch warehouses. As used bits are picked up, they are returned by the Hughes man who is serving that particular area to his head-quarters whether it be in the division office or one of the branch offices. This man is the first Hughes man to see the bits picked up at the rigs. The Oklahoma City division is a fair example. The field man that services the rigs picks up the dulls if he is quartered here, and returns them to the warehouses here in Oklahoma City. If there are any of those particular dulls he has picked up which, in his opinion, should be forwarded into Houston for further examination, he will call it to the attention of his division or district manager, and also to the attention of the division engineer, who is headquartered in this division so that they cannot only acquaint themselves with the particular aspect as being con-

sidered of that particular bit or bits, but also to insure that the proper information is transmitted to the Houston office, so that the engineering department can examine the product upon their arrival.

"Used bits sent to the laboratory at Houston are returned on a return ticket so we can identify them for any reports which are submitted. After passing through these various hands, the bits are set up for examination by the engineers who are responsible for the development and improvement of Hughes bits. There we observe the bits, compare the condition of the bits along with the report that is submitted and in conjunction with the metallurgical department which decides what metallurgical examination should be made, and if another investigation should be made of the bit, other than metallurgical.

"If there is any evidence about the bit that it doesn't have the quality represented in our specifications, we call the responsible man from the manufacturing division to present the evidence to them.

"The field men keep records of the performance of rock bits with respect to the footage drilled and the hours run, along with other pertinent facts and information, the weight carried, rotary speed and gallons of fluid circulated, formations drilled, etc. In addition to markings as to size, and cone type, each bit has a serial number stamped on it. The records will reflect to whom each bit was leased and the location on which the bit was used. It may not always reflect how much the bit drills in how many hours because we are not permitted 100% to collect that information. In the majority of cases, the information would be complete.

23. As mentioned in the United Shoe Mach. case, fn. 76, supra, 110 F.Supp. at page 297:

" * * * Though these practices and methods have not been predatory, im-

moral, nor, on their face, discriminatory as between different customers, they have operated as barriers to competition. * * *"

24. (DX–6, pp. 71–73.)

"Our field salesman (sic) have that history in their files, at their disposition, to study the performance of these bits. If they are trying out a different type of bit in a given formation, they have the past history, numerous records of other types of bits that have been used in those formations, and they are able to make a comparative performance check. It helps them evaluate the merits of the new structure, or change in structure. They know, from observance and a study of those records the right type of bit to be used in these different formations, and they offer that knowledge to the trade in the interest of reducing their drilling costs.

"From our records, one can determine the number of bits that have been used to drill a particular well and in most instances the footage of each bit. The field men have information as to formations encountered and the time factors in drilling of the well. All of this information is used very extensively by customers of the Hughes Tool Company.[25]

"The Hughes Tool Company has around 175 men in the field doing the work I have just described. At Houston, Texas, in the Research Engineering Department and the Products Engineering Department, there are about 20 graduate engineers directly engaged in the development of bits and other men with practical experience in the metallurgical group in the laboratory running drill rigs, and those working in engineering planning whose responsibilities are to fully investigate and coordinate the effect of any change with all other departments that will be affected in the manufacturing division. We have seven division engi-

neers who work on development of rock bits and other products."

Implicit in the foregoing testimony is the inescapable conclusion that in addition to the scientific development which the plaintiff has achieved, the plaintiff has also been placed in an extremely potent position from the standpoint of sales approach. This has given the plaintiff an accurate and continual feeling of this industry's pulse; such surveillance in reality has placed all would be competitors at an insurmountable disadvantage.

The Court's statement in United States v. General Electric Co. in condemning an analogous system, which it termed "industrial surveillance" is appropriate here:[26]

"Although these activities in collating information may have been innocent isolated by themselves and might be readily countenanced as between genuine competitors, here they emanated from a dominant force in the industry to envelope its controlled allies and the few remaining independent manufacturers. In that light, viewed in their aggregate, they represent a picture of espionage and policing activity. This surveillance was not for the ordinary purpose of sharpening competition but rather designed to reinforce and maintain the domination of the industry; and to inhibit the growth of existing, and abort the birth of, new competition. These activities, part of the general pattern of conduct, do not of themselves rise to the level of a violation of the Sherman Anti-Trust Act but they disclose a manifestation of monopoly in the incandescent electric lamp industry by General Electric."

(2) *An aggressive patent policy coupled with wide-spread patent litigation.*

25. Mr. Trigg, drilling contractor, testified:
"Q. The Hughes Tool Company service. What service do they give in addition to leasing the bit? A. They give us service on all wells which have ever been drilled anywhere almost. You can call them and get information as to any wells that were ever drilled, as to the number of days it took to drill the well and the number of bits used on the well.
"Q. And type of bits? A. Yes, and footage they made, if you wanted it." (R–486, 487.)

26. D.C.N.J.1949, 82 F.Supp. 753, 901.

From the beginning the plaintiff has not only aggressively obtained all possible patents related to this industry, but has actively used the fact of their existence in sales promotion and in challenging competition.[27]

For example, Sharp-Hughes, the plaintiff's legal predecessor, publicized that over one hundred and sixty-four patent claims had been allowed in the United States alone and that patents had been obtained in over fifteen foreign countries. This publicity was accompanied by the statement that:

"Any Infringement Or Attempt To Make Our Bit, Or Any Part, Will Be Vigorously Prosecuted To The Limit Of Our Resources." [28]

This announced policy has been diligently carried out.[29]

It should also be observed that the control of the industry in question has been achieved by means of a large number of improvement or combination patents relating to various minor and separate features of the rock bit structure, and not primarily by means of basic patents. The "No. 3 Patent" in suit, which the Court has held to be invalid is an extreme example of the effort the plaintiff has exerted to tie down and keep in check competition by the use of the individual patent monopoly.[30] Although, doubtless, the plaintiff believed some of its patents were infringed at the time this action was instituted, the Court believes the real purpose of this infringement action was to further its existing monopoly and to eliminate the defendant as a competitor.

(3) *An invasive sales policy together with an embracing each opportunity for expansion and market control with such readiness as to discourage and eliminate potential competition.*

For example, sales manager Brown conceived the idea of taking delivery away from the supply houses and having the plaintiff's sales force deliver direct to the customers in order that such sales personnel would regularly visit all active drilling rigs.[31]

The sales policy cannot be divorced from the use of the lease agreement by the plaintiff. Although the abusive manner in which the lease agreement has been used has been considered previously by this Court, its connection with the sales program can bear re-emphasis. The following testimony of Mobley who had the primary responsibility in correlating the practical use of the lease agreement with sales promotion, is pertinent: [32]

"Q. Well, if you had a lease agreement and the lease agreement precluded retipping, why didn't you simply enforce it or write in the lease agreement that you can't do it, and enforce

27. Plaintiff has owned or had an interest in 128 patents relating to drill bits; of these, 20 have been issued since January 1, 1935, which pertained to roller cone bit structures. (DX–2a.) Of these, the plaintiff has never granted any licenses. (DX–2–5.)

28. (DX–71, p. 232.)

29. Patent infringement actions have been brought against (1) Hughes Tool Co. v. Owen, 5 Cir., 1941, 123 F.2d 950; (2) Hughes Tool Co. v. United Machine Company, D.C.Okl.1939, 35 F.Supp. 879; (3) Hughes Tool Co. v. International Supply Co., 10 Cir., 1931, 47 F.2d 490; (4) Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 1950, 180 F.2d 97; (5) Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 1940, 109 F.2d 500; (6) Williams, fn. 2, supra.

In addition, at least 4 lawsuits were settled by an agreement that the defendant would no longer repair bits of plaintiff's manufacturer. These contracts were with (1) A. F. Spangler Company, a corp., Oklahoma City. (DX–7, pp. 22, 23, 24, 25.) (2) Charles J. Owen, doing business as Eastland Boiler and Welding Shop, of Eastland, Texas. (DX–7, pp. 25–27.) (3) Williams Iron Works Co., a corp., Tonkawa, Oklahoma. (DX–52.) (4) The Thompson Tool Company, of Texas. (DX–61.)

30. There has not always been a unanimous approval of these earlier patents. See dissent by Judge Huxman, in the first Williams case, fn. 2, supra, and dissent by Judge McDermott, in the International Supply Co. case, fn. 28, supra, 47 F.2d at page 494.

31. (Mobley, R–309; Kuldell, DX–9, p. 25.)

32. (Mobley, R–344, 345, 346.)

it? A. It wasn't quite the popular thing. At first people hadn't been sold on the idea. There was general resistence to the idea of a lease when I started.[33] After all, we were dealing with our customers, in other words they had to buy our products, and/or lease or what—they had the money and we wanted the money and we wanted them to have the use of the bit. I tried to do the reasonable thing and that was sell the idea, do it through the sales force if I could or any other method, tried to convince them that it would be to their best interest for the lease business to go across, tried to show them in any way that I could, that that was the thing to do for their own benefit in the matter of selling them on the idea. Now the methods they used were many.

"Q. Tell us some of them. A. Well, I hardly know where to start. Well, to begin with, the idea that was developed, this is probably the tail end of it, but after a while we tried through the use of sequestration, I believe you call it replevin here, to make the retippers go to what we said "to the bushes", take his business off the front street, move it to the back street, tried to give the people the idea that he was not a responsible man such as the Hughes was, and better off not to use products that were made by a person such as they were. And in addition, we sold the engineering idea as much as we possibly could. That was one good idea that we used, to fit themselves for engineering data, to improve it. We used other means to demonstrate to the people that because of the irresponsibility of the people who generally handled these things, that there were too many of them, too valuable, to induce dishonesty. We generally sold them the idea that the Hughes Tool Company would develop where it was possible a better bit. * * *".

Other aggressive acts by plaintiff of a questionable character and which demonstrate the energetic and systematic manner in which the plaintiff has eliminated would be competitors are:

(a) During the 1920's the plaintiff owned the Caddo Rock Bit Company. At such time Caddo received a 15% royalty from Reed under the Humason patents. These royalty reports were turned to the plaintiff's sales department to aid in sales promotion.[34] Significantly, the correspondence in connection with these royalty reports often carried specific comments or penciled notations regarding the competitive position of Reed, the only real competitor of plaintiff.[35]

(b) Prior to the time that plaintiff brought suit against the Williams Iron Works, a salesman of the plaintiff learned that Williams was working on a thin financial margin; this employee of the plaintiff approached the First National Bank of Tulsa and induced them to discontinue credit to Williams on the strength of orders from certain drilling contractors.[36]

33. This is understandable inasmuch as at the time of this change from sale to lease the price remained the same.

34. (Dietrich, DX–22, pp. 13, 14.)

35. For example, sales manager Brown asked the salesmen "to state whether these sales in your opinion are the result of intensive sales effort on the part of Reed or whether their tool actually is better adapted to formations encountered than ours. (DX–44a.) The replies of the salesmen clearly show that the plaintiff's interest was not in checking the accuracy of the royalty reports, but was centered upon the question of competition. (DX–44d.) Thus, salesman Schaefer answered Brown's letter on Reed royalty reports by a discussion of the relative merits of the bits of the two companies (DX–45); salesman Long mentioned, "I hate to think what would happen if Reed reduced their price in line with ours" (DX–66); and, he identifies Reed's customers (DX–69); In another letter, Brown said, "Please exercise 'eternal vigilance' and wherever possible win over users of Reed material to our side." (DX–44d.)

36. (DX–47.)
Mobley testified that Walker, the salesman who did this, was in the Tulsa sales department of plaintiff; that Mobley knew that Walker intended to do this, inasmuch as he had discussed it with

(c) When Chicago Pneumatic Tool Company entered into the field as a manufacturer and distributor of roller cone rock bits, in about 1928, Col. Kuldell, president of plaintiff, made every effort to remove them from the competitive field. Kuldell, sent several letters to Mr. Schwab, head of Bethlehem Steel Corporation, stating that inasmuch as Chicago Pneumatic was one of Mr. Schwab's personal companies, that Schwab should see to it that Chicago Pneumatic went no further into the new bit business in competition with Hughes. Kuldell threatened to cut off Hughes purchases of steel from Bethlehem, which amounted to over $1,000,000 in 1928, unless Chicago Pneumatic ceased such competition.[37]

The words of L. Hand in the Alcoa case dealing with the aluminum company's contention it had never excluded competitors is peculiarly applicable at this point:[38]

"It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to manoeuvres not honestly industrial, but actuated solely by a desire to prevent competition, can such

a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent."

## VI

## Conclusion

 This Court concludes that the plaintiff in the instant case has violated Section 2 of the Sherman Act which condemns any "person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations".[39]

 Congress' object in enacting this and related antitrust sections was "to secure competition and preclude combinations which tend to defeat it." [40] The statute is "based upon the assumption that the public interest is best protected from the evils of monopoly and price control by the maintenance of competition." [41] .

The plaintiff throughout the trial and in its brief to the Court has attempted to justify its position in the industry and its high percentage of profit by saying such has merely resulted because of the superior bit produced by the plaintiff and due to the plaintiff's own business thrift.

---

Walker, and Mobley not only failed to tell him to refrain from such action, but was in fact pleased he did it. (R–374.)

37. (DX–49b.)
Although the attitude of Kuldell from a business standpoint may be understandable, his action illustrates the aggressive attitude which has characterized the rise of the plaintiff to its present position of dominance in the industry.

38. Fn. 33, supra, 148 F.2d at page 431.

39. As mentioned in the Kobe case, fn. 8, supra, 198 F.2d at page 423: "As to the intent or the purpose of monopolies, it is not necessary that the proof include specific intent in a criminal sense. If there is a unification and concentration of power and control over a commodity, this in it-

self may make a prima facie case of intent and purpose to exercise illegal restraints and to monopolize. It is sufficient to satisfy this requirement if the consequence of a defendant's conduct or business arrangements results in a monopoly. [Citing cases.]"

40. International Harvester Co. of America v. Missouri, 1914, 234 U.S. 199, 209, 34 S.Ct. 859, 862, 58 L.Ed. 1276.

41. United States v. Trenton Potteries, 1927, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700; United States v. American Linseed Oil Co., 1923, 262 U.S. 371, 388, 43 S.Ct. 607, 67 L.Ed. 1035; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 226, 67 S.Ct. 1560, 91 L. Ed. 2010.

Such a contention was disposed of by Judge Hand in the Alcoa case when he said:[42]

"* * * True, it might have been thought adequate to condemn only those monopolies which could not show that they had exercised the highest possible ingenuity, had adopted every possible economy, had anticipated every conceivable improvement, stimulated every possible demand. No doubt, that would be one way of dealing with the matter, although it would imply constant scrutiny and constant supervision, such as courts are unable to provide. Be that as it may, that was not the way that Congress chose; it did not condone 'good trusts' and condemn 'bad' ones; it forbad all. Moreover, in so doing it was not necessarily actuated by economic motives alone. It is possible, because of its indirect social or moral effect, to prefer a system of small producers, each dependent for his success upon his own skill and character, to one in which the great mass of those engaged must accept the direction of a few. * * *"

Judge Hand went on to say:[43]

"We have been speaking only of the economic reasons which forbid monopoly; but, as we have already implied, there are others, based upon the belief that great industrial consolidations are inherently undesirable, regardless of their economic results. In the debates in Congress Senator Sherman himself in the passage quoted in the margin showed that among the purposes of Congress in 1890 was a desire to put an end to great aggregations of capital because of the helplessness of the individual before them.*

*(Margin) "'If the concerted powers of this combination are intrusted to a single man, it is a kingly prerogative inconsistent with our form of government, and should be subject to the strong resistance of the State and national authorities * * *.' 21 Cong. Record, 2457.

"The popular mind is agitated with problems that may disturb social order, and among them all none is more threatening than the inequality of condition, of wealth, and opportunity that has grown within a single generation out of the concentration of capital into vast combinations to control production and trade and to break down competition. These combinations already defy or control powerful transportation corporations and reach State authorities. They reach out their Briarean arms to every part of our country. They are imported from abroad. Congress alone can deal with them, and if we are unwilling or unable there will soon be a trust for every production and a master to fix the price for every necessity of life. * * *" 21 Cong. Record 2460. See also 21 Cong. Record 2598.

█ It is further the opinion of this Court that the "effect" achieved by the lease agreement of the plaintiff is clearly within the broad language of Section 3 of the Clayton Act, which states in part:

"* * * where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

As demonstrated by the introduced evidence, this lease agreement is being used to eliminate the last true price competition which remains in the roller rock bit "line of commerce", that of the "retipping" of dull bits.[44] As can be deduced from the

42. Fn. 33, supra, 148 F.2d at page 427.

43. Fn. 33, supra, 148 F.2d at page 428.

44. It is interesting to note that Judge Murrah, in his dissent in the first Williams case, fn. 2, supra, 186 F.2d at page 290, without the benefit of the evidence which has been shown this Court, made the following observation: "Undoubtedly, the leasing arrangement when construed to prevent retipping, will have the effect of restraining interstate trade and commerce in the bits to the extent at least that the retipped bits are excluded from the market. And, competition in

"competitive activity reports"[45] the retipping competition has been held to a little over 8% of total bits used; if such retipping should be absolutely prohibited, as vehemently urged by the plaintiff corporation, the plaintiff could expect future sales of over 83% of the total new bits sold, even taking into account the sales of cross-roller bits, which as shown previously, are not completely competitive.

The Court has arrived at the following conclusions of law:

(1) The Court has jurisdiction of the parties and the subject matter hereof.

(2) United States Letters Patent No. 1,856,627 was good and valid at law until it expired on May 3, 1949. United States Letters Patent No. 1,983,316 was good and valid until it expired on December 4, 1951. Both of these patents were infringed by the defendant prior to the expiration dates of the patents. However, inasmuch as the plaintiff is operating in violation of the antitrust laws, no recovery of damages by the plaintiff from the defendant should be permitted.[46]

(3) Inasmuch as the plaintiff is in a position of monopoly and of restraint of trade contrary to the laws of the United States, the plaintiff should be denied any relief under its "lease" contracts and any of its patents relating to roller rock bits, as to the defendant, until such time as the said unlawful monopoly is dissolved and its dominance relinquished; and, pending such event the plaintiff should be enjoined from asserting or claiming any violation of said "lease" or infringement of said patents.

(4) The defendant should recover treble the amount of damage he is able to show resulted from the plaintiff's unlawful monopoly.[47]

(5) The defendant should recover attorney's fees for the prosecution of his counterclaim.

(6) The defendant should recover all costs expended upon all phases of this action.

---

the bits will thus be lessened to the same extent. * * *"

45. (DX–28a–28k.)

46. Inasmuch as this Court has determined that the "No. 3 Patent" in suit is invalid, there is no question regarding its infringement; however, even if this "No. 3 Patent" had been found to be valid, as the Court views this case, there would be little if any practical difference in the ultimate disposition of this case. Clearly, a patent is in itself a limited monopoly, authorized by law, if used without abuse. However, as stated by Justice Brandeis, "The lawful individual monopolies granted by the patent statutes cannot be unitedly exercised to restrain competition." Standard Oil Co. (Ind.) v. United States, 1931, 283 U.S. 163, 174, 51 S.Ct. 421, 425, 75 L.Ed. 926.

47. At the outset of this case it was determined that the issues of liability and damage would be tried separately. Thus, if no violation of the antitrust laws was found there would be no need to introduce evidence on the damage question.